Next case for argument is 16-1649 Maverick Tube Corporation v. United States. And as the parties well know, we've divided this up based on the two issues. So the first issue, those arguing the first issue, you know who you are. Whenever you're ready. Ms. Mendoza. May I please the court? Julie Mendoza, appearing on behalf of defendant appellant Borisan Manisman. In this case, Congress should never have resorted to adverse facts available. Borisan fully cooperated with Congress's investigation and confirmed explicitly that it would supply any information that Congress demanded. In other words, the facts of this case are completely different from the facts in the other cases cited by the party where this court has affirmed an adverse facts available. Borisan never claimed the information did not exist and then produced it as a nip on. Borisan did not provide false information or incorrect information. And it did exactly the opposite of what respondent did in touching. It replied to the department's questionnaire and told the department that it fully intended to cooperate. This court articulated in the case of Nipon Steel v. U.S. that it was appropriate for Congress to apply facts available, in other words, neutral facts available. Well, did your client ever say to the government that it was unable to submit the required data, that it didn't have the resources to compile the missing data or anything of that sort? Your Honor, our client did say it was unable to and I would submit that the definition of unable is defined in 1677 and C, which says that unable means that there is a burden on the respondent to provide such information and that Congress can have due consideration of that fact and provide for relief from such an unreasonable burden. So I would suggest that the regulation itself defines unable not as impossible, but rather as presenting a great, an unreasonable burden on the respondent to provide the information. But isn't that a fact question of a court to which we defer? Your Honor, I believe that in this particular case there are some very important facts, one being that Borison offered specifically to provide the information if Congress needed it. In other words, Borison believed that the department did not need the information because it was with respect to production facilities of non-subject product. And therefore from the date of its original questionnaire, Borison stated it was perplexed as to why the department needed the information and it explained the enormous burden that it would entail in providing all of that information. But at the same time in its supplemental questionnaire it was very clear that to the extent that Borison had misapprehended the department's request, it did, that if we had misapprehended it and it was not an invitation to explain exactly why that burden was so great and it was unable to do so, then it stood willing and prepared to provide any information that the department required. So you referred to, I think, the language of 1677MC. I read that to say if the recipient of the request is actually unable to submit it in the form requested, then you can tell that to Commerce and Commerce can say submit it in a different form and in figuring out what the different form is, we'll take account of the burden. But that does not mean that it's enough to say we're able, but it would be very burdensome. Well, Your Honor, I believe that the language concerning unable to submit the information in the requested form. Right, in the requested form and manner, together with the full explanation. Okay? So it's a full explanation of why you're unable to do it. And then the Commerce Department is required to consider your ability to do so. In other words, it's been the practice of the department that to the extent that parties present information as to why something would be extremely difficult to do, that the Commerce Department has often taken that into account and either excused the reporting or required them to present it in a way they proposed. Now, in our particular case, there was, where Commerce had asked us to report, and we had for the Gemlick Mill that produced subject merchandise, every single invoice and every single line item on an invoice for an entire year for all the purchases of that plant. Boresan was very aware that that's the form in which Commerce required the information. It was that, in fact, that was so difficult to do. And certainly there was no suggestion that Boresan could have provided some sort of summary information or half information. And certainly Boresan wasn't proposed to. But did Boresan say, we've got these other plants, they're ours, we cannot provide for those, is it two other plants? Yes. Two other plants, the same information in the same form that we just provided for the one plant? Your Honor, no. Boresan never said it was impossible. In fact, it was quite clear to the department from our original response that it was not impossible. We said that it was extremely burdensome. Therefore, when the department came back in its supplemental questionnaire and said, okay, we've read your response. You said that you provided it for the Gatlin Mill. And so please provide the information for the other mills or explain why you were unable to do so and the reasons for that. Which is exactly what Boresan did in response. Let me understand what happened. So the government comes, you say we can't do this, this is terrible, and then the government comes back and says, no, you've got to do this. And they say any undue delay or lack of response may result in our proceeding with information based on the facts available. And what did you do in response to that? Your Honor, I would suggest that the full supplemental questionnaire in fact said, please, we read your questionnaire, you provided information for Gatlin, please provide information for the remainder of the mills or explain why you weren't able to provide that information and detail the reasons. So Commerce actually asked Boresan, I mean, we believed rationally, reasonably at the time of receiving that supplemental questionnaire that the department had read our original response, which was very clear that it was not possible but rather extremely difficult. And therefore when the department responded with a supplemental questionnaire which said either give the information or explain why you weren't able to do so, we reasonably believed that the department had recognized the problems that we were encountering and was asking us to provide the information with respect to why it was impossible, not impossible, I'm sorry, Your Honor, why it was not, why we were unable to do so. And so I think that given that context, in other words, given the context that when Commerce came back in the supplemental questionnaire, they already knew that it was not impossible but merely very difficult and said to us, please explain why you were unable to do so. To us as practitioners in the area, unable to do so does not mean impossibility, it means that it's reasonably burdensome and unreasonably burdensome. And for that reason, we believe that we had a legitimate basis given that this was information with respect to plants that didn't produce subject merchandise, benefits to plants that did not have any subject merchandise, that it was appropriate for us in those circumstances to explain it to Commerce. But if we were misapprehending the department's question and we didn't fully respond, we made very clear that we were prepared to provide the information should Commerce ask us for it. And I think given those circumstances and given the fact that four and a half months transpired between the date of that response and Commerce's post-preliminary determination, that Commerce could have asked us, it would have been a simple matter to say to us, no, you must provide the information, at which point we said we were willing to do so. Okay, why don't you enter your rebuttal talks again to say that and we'll hear from the other side. And you all are dividing the time up seven and three, correct? We'll run the clock separately for each of you. Good morning, may I please report? Why is your friend not right? Maybe there's a lot of communication going back and forth and there are a lot of lengthy forms and questionnaires, so maybe there was a misunderstanding here as to whether or not some lines had been crossed. But at the end of the day, my understanding is when Morrison responded to the supplemental questionnaire, it continued to maintain it was burdensome, et cetera. But it also said, but we stand ready to provide the information with the understanding that it will require several weeks to do so. So why didn't somebody say, okay, you've got until whatever day, get us the information, and that could have resolved the whole matter, right? Well, Commerce was under no obligation to provide that third opportunity to Morrison. Commerce clearly, from the original questionnaire, continuing on to the supplemental questionnaire, made it very clear that we are requesting the information for all your mills, including the two mills that Morrison did not provide the information for. Morrison never stated that he was unable to provide that information. Today, they argue again in their briefs, they argue that they did state so. Unable means unable. You cannot. It means you lack the means to comply. Ms. Mendoza says, and I think this is right at the heart of her pitch, that in this world, in practice, everybody knows that unable is a much softer concept, and Commerce so treats it. What do you say to that? I'm not sure I understand. You mean unable is a softer concept? Right. Unable doesn't mean we can't do it. It means it would be really, really, really burdensome. And Commerce regularly says, oh, okay, that's fine. We'll redefine. Is that true as a matter of practice? Unable means you cannot. It does not mean impossible. I don't think that term is open to interpretation. But aren't there circumstances where somebody will come back to you and say, look, can you please reevaluate if you really need all this stuff because it's going to take us a year, and here's why, and $10 million to be able to retrieve this data? Doesn't Commerce consider that? Certainly. Under the statute, under 1677MC, parties have, they can go to Commerce and say, we're having difficulties in supplying the information in the manner you requested. But they have to do so promptly. Once they receive a request from Commerce, they have to promptly go back to Commerce and say, we can't submit it in the requested form. I'm sorry, 1677MC, where does it say that you can go and say, we're able to do it, but it's difficult? No, no, that we're unable, I'm sorry, that you have to go back promptly to Commerce and say, we are unable to submit the information in the manner that you've requested. So let me just ask again so we're understanding what I'm saying. Let me posit for purposes of this question that you are 100 percent correct about the ordinary meaning of the word unable. Put that aside. Okay. Is it true or not true as a matter of practice that people come to Commerce and say, this is very difficult, and Commerce says, oh, okay, we'll figure out a less burdensome way to do it? Yes. Under what? Under 1677MC. But if that's true, it seems to me you've just conceded that the word unable in 1677MC does not mean impossible to do. It can include very burdensome. No, parties can do that under that statutory provision. Why? Because they're unable to provide the information in the manner requested. I think you have to read the statutory provision together. And it also says you have to provide alternative forms. I kind of think you're giving away your case here. You have to provide alternative forms in how you can submit that information. Even if all they say, if they say in terms, we're able to do this, but it's very difficult. No, no, no. You have to be unable to submit the information for whatever reason it is. And you can explain why, but you have to be unable to submit the information. That's what the statutory provision provides. But you apply that provision, do you, even if it's not impossible, but it's merely very, very difficult? And so as a matter of practice, you interpret the word unable in 1677MC to include great burden? No. Unable is unable. You cannot provide that information. I don't have the exact thing here, but doesn't 1677MC start off, doesn't the C say, describe difficulties in meeting requirements? That's the title. That's the title. So doesn't that suggest difficulties in meeting, I mean, doesn't that suggest that there's some give there, that it's difficult? Because being difficult and being impossible are two very different things, right? And the title of the subsection is difficulties. The title is, but when you read the statutory provision, it's saying unable to submit the information. That's requested. In the form requested, then you can consider other forms, and in the course of defining what the other forms are, you can consider difficulties. Correct. And even that's discretionary. Commerce may modify requirements. So even that's discretionary on the part of Commerce, whether they're going to. And here, let's step back. BARSA never even complied with these statutory provisions. It waited until a supplemental response, the due date, when a supplemental response was due, to say where we can provide it, but we're experiencing burden somewhere, and that's when they cite to that statutory provision. That's not promptly. They also did not give, they never stated they were unable to. They didn't act promptly, and they also did not suggest any alternative forms of providing the information for those two males. They just simply stated. But at the end of the day, they did say, okay, if we haven't persuaded you that this is burdensome enough, we'll provide it in two weeks. So an alternative would have been, Commerce had the authority to call them up and say, okay, it's due by such and such a date, right? Did Commerce have the discretion? Sure, but Commerce also had discretion not to do that, which is what it did here. There was no legal requirement for Commerce to go back to them yet again. They specifically did not respond to Commerce's requests twice. They didn't respond. They did not give that information, and they never said they were unable to give the information. And based on that, Commerce properly found that they failed to act to the best of their ability. They didn't put forth their maximum efforts. They also didn't ask for an extension. They could have done that. They could have said, you know what? We can provide this to you. It's burdensome and everything. We can provide it to you. We need additional time. They didn't even do that at all. They didn't ask for an extension. They didn't say they were unable to do it. They didn't submit the information, and they didn't act promptly or suggest alternative forms. So force on board the full responsibility here in how this played out for the company. Okay. Thank you. Thank you. May it please the Court. My name is Kelsey Rule, appearing today on behalf of Cross Appellants U.S. Steel and Maverick. Briefly, I'd like to address the most important aspect of the AFA issue, which is the best of its ability standard in Section 1677E. Bourson's interpretation of the standard will allow responding parties to stall investigations by arguing each point of Commerce's questionnaires. Bourson claims that it acted to the best of its ability to comply with Commerce's request in two ways. First, by providing a legal argument that the information Commerce requested was not necessary to the investigation. And second, by indicating that it could provide the requested information in due course if Commerce disagreed with its legal argument. Bourson fully understood Commerce's request, and by its own admission, the requested information was in its custody. Well, what specifically did Bourson say about the burden of collecting this information at that point? Well, about the difficulties that Bourson faced in gathering data, which is at pages 6 and 7 of its opening brief. Bourson here claims it was an unreasonable burden to report the purchased data in the manner requested because of how it was stored in two separate systems. However, nothing prevented Bourson from providing the data from the two systems in its raw form and then describing to Commerce how to reconcile it. This would have been an imperfect response, but it would have been usable, timely, verifiable, and under Section 1677M, subparagraph E, Commerce would have been obligated to use that information and we wouldn't be talking about adverse inferences. Now, Bourson's conduct falls far short of the best of its ability standard articulated by this Court in Nippon-Steele, setting aside for a moment the fact that Bourson's legal argument misapplied Commerce's attribution regulation, and I refer the Court to page 58 of the appendix for that. It's entirely inappropriate for a responding party to raise legal arguments in a questionnaire response in lieu of providing the requested information. And this is for two primary reasons. First, at this stage in the investigation, Commerce was still building the administrative record. Bourson's response asked Commerce to weigh the probative value of information that was not before it. Essentially, Bourson turned the investigation on its head by prejudging the countervailability of its own subsidies and using that as an excuse to withhold information from the record. Second, and most relevant to petitioners, Bourson's unwillingness to provide the requested information until after Commerce considered its legal arguments deprived the other interested parties of the opportunity to review and comment on the relevance of that information. Thank you. Thank you. So that... Oh, you have three minutes left, Ms. Mendoza. Sorry. I would just like to address three main points. First of all, the statutory provision is entitled difficulties, and I would suggest that the Department has admitted that its practice is to consider the ability of the respondent to provide the information and not simply that the respondent is required to submit a statement that says it's impossible to provide this information. So the Department has admitted and, in fact, it is their practice to consider such requests. Secondly... Well, I mean, at most, if they've admitted anything, it's that there's some discretion there, but then their discretion is dictated by the circumstances of the case. And as they describe it here, you had plenty of chances and your information was insufficient. So in the exercise of that discretion, they said, no, too little, too late. And we believe that what sets this case clearly apart from many other cases is the fact that we so clearly indicated our willingness to do so. And the fact is that the Department... Is this the final thing in response to the supplemental question here? Yes, correct. Yes. And I think their response would be, too little, too late. But, Your Honor, I mean, I would suggest that what the Department generally argues in these cases is that it is administratively impossible for them, due to their tight time deadlines, to do such a thing as to request this information. And I would suggest to you that that consideration didn't exist at all in this case. The Department gave itself a four-and-a-half-month extension to decide this very issue and, therefore, had sufficient time. And it is the obligation of the Department to try to seek the most accurate information possible. And what purpose was served in this case? By applying facts available to Borison, it didn't need to be forced to respond. Borison said it would respond. And there was no issue that Borison somehow was advantaged by not responding to the questionnaire. And, therefore, under the circumstances of this case, there was no basis, and for the Department to have applied adverse facts available, there was no purpose served by doing so. All they had to do was to ask Borison to provide the information, which they did not. Thank you. Thank you. That concludes the argument with respect to what we've designated as Part 1 of this case. And I guess we've got a relatively new cast of characters for Part 2. It's Ms. Mendoza's. Ms. Mendoza, you can stay where you are, but where's Mr. Leonard, who's arguing on this? Okay, so we're set, even though it's confusing to us. We were thinking of moving on. All right. And then you are Mr.? Great. Okay. So you've got a total of 10. We're going to run your clock at 7. May it please the Court, Robert D. Francesco on behalf of Cross Appellants, Maverick 2, and U.S. Steel. I'm going to discuss today the issue of the benchmark analysis in the Department's original determination and whether they should use a Tier 1 or Tier 2 benchmark in measuring the adequacy of remuneration with respect to Hot Wheels Steel. We believe the Court of International Trade improperly disregarded important aspects of the Department's original determination and on this point substituted its judgment for that of the agencies. And as such, we believe this Court should reinstate Commerce's original determination that the Hot Wheels Steel market in Turkey is distorted through government intervention and through government action. In the original investigation, the Department of Commerce determined that at a minimum, the Turkish Hot Wheels market, that there's a significant amount of government intervention through the government entity, but that it could also be a majority of that portion of the market. And given the holes in the record, that the Department was forced to interpret the record as it stood before it and apply facts available, and that because of the lack of information that the Turkish government didn't supply, the amount of Hot Wheels Steel production for all of the Turkish Hot Wheels Steel participants, the Department of Commerce wasn't able to accurately determine whether it was a majority or a substantial portion. And it said, based on the facts in front of it, the admission that it was, that the Turkish entities that were government controlled were at least a majority. Now looking at the formalities, we look through the Court of International Trade to Commerce and we're reviewing Commerce's second determination, albeit perhaps coerced, rather than its first one, right? Well, I would posit, Your Honor, we're arguing that the first Court of International Trade determination remanding it back to Commerce was flawed. And at that point, when it came back to the Court of International Trade, the Department of Commerce made that determination under protest, but complied with what it believed the Court was asking it to do. And we would posit that the first determination by the Court of International Trade was an error on that issue. Does it matter in these cases in differentiating between Tier 1 and Tier 2, whether the government seems to have a good reason for not, I know we talked about, I don't want to get into a discussion of the word unable again, but whether the government really just says, we've got the data, but you can't have it, or whether the government has a reason for not being able to provide it? That's a good question, Your Honor. In this case, the government of Turkey didn't, they simply said, we're providing you with the flat-roll market, which is much broader than simply the hot-roll market. We've made arguments in our brief, both below and here, that that should have amounted to an adverse inference here. The Department of Commerce didn't make an adverse inference. We think you can still reach a determination on the facts available that the Turkish government could have supplied that information and should have supplied that information. They supplied that information in previous cases or cases after this one. In fact, at the Department of Commerce's hearing, one of the attorneys for the Turkish respondents admitted that had the department done verification on this issue, that they could have supplied that information. So that's what I'm just trying to figure out. It's not one side or the other. How the ability or the ease with which the government could do it or not do it, does that play at all into a differentiation between Tier 1 and Tier 2? No, I think it plays into whether they would apply an adverse inference with respect to whether it was a majority or a substantial portion, which would dictate whether it was Tier 1 or Tier 2, but not necessarily whether they could comply or not, if I understand Your Honor's question. You don't think that in making a determination whether the amount of the foreign government's sales is adversely affecting, i.e. lowering, the price of non-government sellers in that foreign country, it is relevant to consider what other information might be available and is not being supplied? Because it doesn't make sense, simply as an economic matter, to say that a simple percentage without more automatically means that the non-government sales have been improperly dampened. So, two points, Your Honor. The department's preamble talks about if there is a majority, it then will normally determine that it is, in fact, distorted. If it's something less than a majority but a significant portion, in certain circumstances, it may also find that it's distorted. This is this kind of switchback sentence with something and an unless, and then it's, yeah, not the clearest standard. Now, the department's practice has been, in these instances, on occasion they will look at other factors, but the other factors they will look at is not exhaustive, and they've looked at other types of factors in the past. In this case, the department was unable to look at those other factors because some of that evidence was not supplied by the Turkish government. And the CIT said in the first round, we read these pages of your opinion, the 95-14 to, what is it, 20 or something, as sounding an awful lot like you're saying and because the number was somewhere north of 25%, multiplying 50 by 50, then we will, per se, in this case, without considering more, find an adverse dampening of the non-government sellers' prices in Turkey. And that that really didn't seem quite right under this sentence in the preamble, so go and explain again. Why was it not entitled to do that? It wasn't even conclusively resolving the issue. Because that analysis that the court applied, which was that it's assuming 25 and 25, right, that assumes that it's not a majority. It couldn't have been a majority. It's assuming that the proportion, that the word majority, in this case was 50% of domestic production. It could have been 60. It could have been 70. It could have been 80. It could have been 90. We don't know because the Turkish government didn't supply the full amount of production and shipment data by the other Turkish producers in this instance. So the Court of International Trade, by coming to that conclusion, was improperly plugging facts that the Department of Commerce, in its original determination, said it didn't have. The Department of Commerce said, I don't have this information available to me, and based on the facts available, I can conclude that it is a majority of a majority and that it is distortive, that the information I requested wasn't made available and the information with respect to other factors wasn't made available to me either, and that this is the best information I have in front of me. Okay. We'll keep your rebuttal time. Ms. Mendoza, you've got seven minutes, and your colleague has three. First of all, I would like, Your Honor, to clarify an important fact in this case, which is that the government of Turkey stated that it did not have the hot-rolled coil information with respect to the market share of the individual companies in Turkey. Commerce found no reason and no evidence that that was not a correct statement. In fact, the Department even responded to our argument about why they had not conducted verification by explicitly saying that they accepted the Department's statement, the government of Turkey's statement, as true and accurate. And that statement was, we don't have the data on the hot-rolled coil market shares. Therefore, while the Department, in its remand, makes some assertions that somehow the Turkish government might have had the information and it might have been to their benefit not to provide it, the facts of the case don't support that. And while the government has not filed a brief in this case, because it has not appealed this decision, if you look at their comments in response to petitioners' arguments in the remand, you will see that the Department very clearly says that there's no evidence in the record to contradict the government of Turkey's statement that it did not have this information. Therefore, this entire appeal is premised on an incorrect assumption, which is that somehow there was information out there that the Department did not have and could not use. When, in fact, the Department had the very information with respect to market share that it had gleaned from various sources, it used that market share information in its remand, and it proved that, in fact, Erdemir and Izmir did not have a majority share. While the Department originally chose to go forward with the information with respect to a majority of majority, they clearly also had that other information available. But the critical point here is that the Department accepted there was no contrary evidence that the government of Turkey did not have this information. Now, the Court's finding in Nippon that if a party doesn't have the information that's required, then by definition it's unable to provide the information, and therefore that's the end of the inquiry. To the extent that the plaintiff is now claiming that somehow the Department should have looked at other evidence here, there's no support in the record for that finding. And finally, I would just like to say that all of Petitioner's arguments about the errors in the decision-making by the Court relate to this issue of facts available. In other words, their argument is basically because the government of Turkey did not cooperate and provide the information required, not supported by the record, therefore the Court should have given commerce a pass, essentially. It should have applied a less stringent standard, and it should have accepted the Department's assertions that a majority of the majority was sufficient. And I would just submit that there is no basis, in fact, for that argument. There is no factual basis for that argument, and therefore all of the plaintiff's arguments must be dismissed. Thank you. Thank you, Mr. Court. Mark Lennart on behalf of Çocuk and Çayırova, who are two Turkish producers of oil country tubular goods. I just wanted to address the math argument that we made in our brief. My friend over here said that the business goes to market share, and the Department of Commerce's statement that the government of Turkey accounted for at least a substantial portion, and arguments by the parties that it might have been, or there's a possibility that it was a majority, and that's maybe justifying a per se application of the rule. And my colleague here, my friend over here, said that the government of Turkey could have accounted for 60 or 70 or 80 or 90 percent of the record, but the math simply says that's not true. Information on the record, and the commerce in its remand properly concluded that simple arithmetic undermined the argument. There are three types of parties here, and with relevant data there's Erdemir, which is the government of Turkey proxy here, other Turkish producers and importers, or imported volume. And the record contains information about Erdemir's production volume. It also contains information about my client's production, and also the other Turkish producers, all of them, there are only five. Not just the capacity information, but the production information. Of the five, there's production information known for three, and capacity of two. I thought there was a chart that showed the capacity for all five, stable from 2012 to 2017. Right, there is a chart, and there are two types of numbers that we put into our brief. One was a reasonable estimate of the actual production, and with our reasonable estimate of the actual production of the two, that the actual production numbers are not available, then Erdemir was less than 40 percent. But even without those, assuming, which we would say is an unreasonable assumption, that those two plants were titled for 12 months, Erdemir is still less than 50 percent of the market. So any significance that the government below, or the parties have given to the at-least language, or arguing that there's a possibility, is simply undermined by math. Is there no questions? Thank you. Thank you, Your Honor. Just a few quick points. In a previous determination by the Department of Commerce a year earlier, in the case Stainless Steel Sinks, the department was presented with almost the identical set of facts, where the government of China provided data on market share on an overly broad category, not on the category that they were looking at. The Department of Commerce looked at that information, and there was other evidence in the record. There was evidence in the record where there was discussion about whether they were a majority, and the Department of Commerce said, at a minimum, they are a substantial portion, and therefore we're going to find on the facts available that the market is distorted. And they didn't look to necessarily other factors, because there weren't any other factors on the record, and they relied on that decision. With respect to the math issue, we take issue with how they're calculating the math for a couple different reasons. One, the two that are missing, one of those two producers put a new hot mill in the year that we're looking at, and there's no evidence that they were actually... It was 2012. 2012. There's no evidence that they were actually producing, and if they were, it would have been minimal, because they were just ramping up. One. Two, and you still don't have information on the second one. And the import statistics that they put on the record appear to be over-inclusive, because it's covering a broad category that includes more than just hot roll coil. We've raised this in our brief, and it's in our brief there. The Department of Commerce recognizes this in its revamp determination, when it says we're uncomfortable doing this comparison, because these appear to be disparate sources of data where we're maybe comparing apples and oranges. And again, going back to the math, where you do have production information from the two Turkish entities that are state-owned, which is a group, when you compare the capacity utilization rates from the two different data sources, they're wildly different. So they appear to be coming from different data sources and possibly being reported on different bases, which again, supports the Department's determination on the remand, when it said we're being forced to compare apples and oranges here, because these don't appear to be accurate, but the court wanted us to go back and take a look at this, and so they did. We believe that's why their original determination, which follows the same analysis in stainless steel sinks, which was reviewed earlier, to say, based on the evidence we have in front of us, this is an imperfect record, and we're going to find that it is at least a substantial portion, and therefore, distortive. And that's all I have, Thank you. We thank all sides, and the case is submitted.